**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YASMINE MELEHY,<br>*Personal Representative for the Estate of Abdel Shakour Shaalan*,<br><br>Plaintiff,<br><br>v.<br><br>HALA SALHA, *et al.*,<br><br>Defendants. | Civil Action No. 21-2873 (ABJ) (SEALED) |

**MEMORANDUM OPINION**

Plaintiff Yasmine Melehy filed this survival action on behalf of her late-husband, Abdel Shakour Shaalan, against defendant Hala Salha. Second Am. Compl. [Dkt. # 52]. She alleges that defendant defrauded Shaalan out of $1,000,000 through a fraudulent wire transfer and $196,000 through a series of allegedly fraudulent monthly checks while she worked as his executive assistant at the International Monetary Fund. Second Am. Compl. ¶¶ 55–64.

The initial complaint in this case was filed on October 29, 2021 against defendant Salha and Capital One, N.A. ("Capital One"), Shaalan's bank. Compl. [Dkt. # 1].[1] It consisted of one count of fraud against Salha, one count of aiding and abetting fraud against Capital One, and one count of conspiracy to commit fraud against both defendants. Compl. ¶¶ 70–95. It alleged five fraudulent transactions:

1) a $1,000,000.00 wire transfer in November 2014;

2) a $1,000,000.00 cash withdrawal in January 2015;

1 Plaintiff originally named Capital One Financial Corporation as defendant, but the parties later substituted in Capital One, N.A. as the correct party. Joint Mot. to Substitute Party [Dkt. # 6]; Minute Order (Dec. 6, 2021).

3) $453,040.96 in checks between 2014 and 2019;

4) $127,801.49 in charges on an American Express card between 2014 and 2019; and

5) $371,035.00 in wire transfers and fees for the benefit of Shaalan's nephew, Mohamed Shaalan, beginning in 2015.

Compl. ¶¶ 63, 72(a)–(e).

Both defendants moved to dismiss the complaint for failure to state a claim. Def. Capital One's Mot. to Dismiss [Dkt. # 8]; Def. Salha's Mot. to Dismiss [Dkt. # 11]. The Court granted Capital One's motion, dismissing the counts against the bank without prejudice. Mem. Op. [Dkt. # 19] at 18. It granted in part and denied in part Salha's motion, dismissing the conspiracy count and the portion of the fraud count related to the checks and wire transfers to Shaalan's nephew without prejudice. *Id.* at 9, 12–13, 17–78.

Defendant Salha answered the remaining claims, Answer [Dkt. # 20], and on October 31, 2022, the Court entered a schedule for further proceedings that allowed time for amended pleadings, discovery, and dispositive motions. Scheduling Order [Dkt. # 23].

On November 2, 2022, plaintiff moved for leave to file an amended complaint. Pl.'s Mot. for Leave to File the First Am. Compl. [Dkt. # 24]. The proposed amended complaint added new allegations with respect to defendant Salha and the fraudulent checks, claiming that she "regularly wrote" herself checks using Shaalan's checkbook. Am. Compl. [Dkt. # 24-1] ("Proposed First Am. Compl.) ¶¶ 47, 55. It also added a new claim against Capital One for negligence. Proposed First Am. Compl. ¶¶ 88–97.

Both defendants opposed the motion, *see* Resp. of Def. Salha to Pl.'s Mot. [Dkt. # 26]; Resp. of Def. Capital One to Pl.'s Mot. [Dkt. # 28], and the Court granted it in part and denied it in part. Mem. Op. [Dkt. # 32] at 7–11. It permitted plaintiff to add the allegations related to the

checks written to Salha herself, but it dismissed the negligence claim against Capital One. *Id.* After amendment, the fraudulent transactions alleged were:

1) a $1,000,000.00 wire transfer in November 2014;

2) a $1,000,000.00 cash withdrawal in January 2015;

3) $453,040.96 in checks between 2014 and 2019; and

4) $127,801.49 in charges on an American Express ("Amex") card between 2014 and 2019.

First Am. Compl. [Dkt. # 35] ¶ 73. Defendant Salha answered the first amended complaint, Answer to First Am. Compl. [Dkt. # 38], and the parties engaged in discovery.

On September 19, 2024, plaintiff filed a motion to amend the complaint again. Pl.'s Mot. for Leave to File the Second Am. Compl. [Dkt. # 42] ("Second Mot. to Amend"). The motion announced that the proposed second amended complaint did not pursue new claims but rather sought to "truncate and eliminate damages." Reply Br. in Supp. of Second Mot. to Amend [Dkt. # 46] at 1, 7. But the revised operative document withdrew a number of allegations. Specifically, it eliminated the allegations related to the American Express card charges and the cash withdrawal in January 2015. *Id.* at 1–2. It also eliminated allegations regarding any fraudulent checks written to third parties and narrowed the allegations to include only those checks for which plaintiff had proof in the form of a canceled check. *Id.* at 2; *see* Proposed Second Am. Compl. [Dkt. # 42-1] ¶ 48.

Defendant Salha opposed the motion to amend on the basis of "undue delay, dilatory motive, bad faith, and prejudice." Def.'s Opp. to Second Mot. to Amend [Dkt. # 43] at 15. Defendant also moved to dismiss the first amended complaint with prejudice as a sanction for plaintiff's alleged spoliation of documents, discovery abuses, and other bad faith litigation

conduct. Def.'s Mot. to Dismiss & Additional Sanctions [Dkt. # 44]. She also moved for sanctions under the Federal Rule of Civil Procedure 11. Def.'s Mot. For Rule 11 Sanctions [Dkt. # 50].[2]

On November 1, 2024, the Court denied the portion of defendant's motion seeking sanctions without prejudice, reserving the option to take up the sanctions issue after resolution of the merits. Order [Dkt. # 51] at 1. The Court granted the motion for leave to file the second amended complaint, but it ordered that all of the claims that had been withdrawn would be dismissed with prejudice. *Id.* at 2. Defendant answered the second amended complaint. Answer to Second Am. Compl. [Dkt. # 53].

Pending before the Court is defendant's motion for summary judgment on the second amended complaint, which consists of one of fraud claim against defendant Salha. Def.'s Mot. for Summ. J. & Mem. of Law in Supp. [Dkt. # 56] (SEALED) ("Def.'s Mot."). The motion is fully briefed. Pl.'s Mem. in Opp. to Def.'s Mot. [Dkt. # 63] (SEALED) ("Pl.'s Opp."); Reply in Supp. of Def.'s Mot. [Dkt. # 65] (SEALED) ("Def.'s Reply").

For the reasons stated below, defendant's motion will be **GRANTED.** The portion of the fraud claim related to the November 2014 wire transfer and the checks cashed before October 29, 2018 is barred by the statute of limitations. As to the surviving portion of the claim, which consists of allegations related to two checks cashed in October and November of 2018, plaintiff has failed to adduce sufficient factual material to raise a genuine dispute of material fact as to any element of fraud. The Court was required to accept plaintiff's allegations as true when ruling on the sufficiency of the series of complaints, but this was the point when she was obliged to prove them.

2 The discovery motions were referred to an addressed by a Magistrate Judge, who imposed sanctions on plaintiff and her counsel with respect to discovery issues. *See* Orders [Dkt. ## 72, 75].

## BACKGROUND

Abdel Shakour Shaalan was the Executive Director of the International Monetary Fund ("IMF") from 1992 until about November 1, 2014. Def.'s Statement of Uncontested Material Fact [Dkt. # 58-1] ("DSUMF") ¶ 1, citing Decl. of Hala Salha, Ex. A. to Mot. [Dkt. # 58-2] ("Salha Decl.") ¶ 1. From October 2001 to the end of his tenure, Hala Salha was Shaalan's Executive Assistant, and in that role, she performed both work-related and personal tasks for him. DSUMF ¶ 2, citing Salha Decl. ¶¶ 1, 5. Due to his glaucoma and poor eyesight, Shaalan would often ask defendant to review records for him, annotate them, and review the annotations with him verbally. DSUMF ¶ 14, citing Salha Decl. ¶ 5. According to defendant, the two had a close working and personal relationship, as Shaalan's first wife passed away in 2012, and he had no children. DSUMF ¶¶ 3, 16, citing Salha Decl. ¶¶ 6, 16; *see* Ex. 5 to Salha Decl. [Dkt. # 56-8] (SEALED) at 4 (email from IMF employee to defendant after Shaalan's death stating, "I know how much he appreciated you and that you were like a daughter to him").

### a. The $1,000,000 wire transfer

In the fall of 2014, Shaalan was not reappointed as the Executive Director of the IMF, and he became a Special Advisor to the Managing Director, which was an unpaid position. DSUMF ¶ 4, citing Salha Decl. ¶ 1; Ex. 2 to Salha Decl. [Dkt. # 56-5] (SEALED) (letter appointing Shaalan as Special Advisor). As Special Advisor, Shaalan's previous staff of ten IMF employees was reduced to one: the defendant. DSUMF ¶ 5, citing Salha Decl. ¶ 1.

On November 1, 2014, defendant was assigned to work in the IMF Secretary's Department. DSUMF ¶ 5, citing Salha Decl. ¶ 2. Around that time, Shaalan asked her to continue working for him only; according to Salha, he said that because staying with him instead of transferring to a high-level IMF employee placed her future career at risk, he planned to give her $1,000,000 so

that he could be assured that she was financially secure. DSUMF ¶ 6, citing Salha Decl. ¶ 9. Around the same time, Shaalan also designated defendant as the sole beneficiary of his IMF staff retirement plan. DSUMF ¶ 12; Ex. 4 to Salha Decl. [Dkt. # 56-7] (SEALED) (Shaalan's IMF Designation of Beneficiary form listing defendant as the primary beneficiary and describing her as a "Friend").

Defendant decided to accept the gift, and she recounts that Shaalan asked her to contact his bank to set up the funds transfer. DSUMF ¶ 7, citing Salha Decl. ¶ 9. On November 3, 2014, defendant and a Capital One Branch Manager exchanged emails regarding the transfer. DSUMF ¶ 8, citing Ex. 3 to Salha Decl. [Dkt. # 56-6] (SEALED) ("Emails"). At 10:29 a.m. that morning, defendant emailed the Branch Manager her personal banking information and account number. Emails at 5. He responded thanking her and adding, "Please specify the amount as well." *Id.* She replied, "Mr. Shaalan told me that he informed you over the phone of the amount he wishes to transfer into my account." *Id.* at 4. He responded, "Yes, but I need it on the email to get the approval from the district manager. My limit only goes to 500k." *Id.* She wrote, "I asked Mr. Shaalan and he confirmed that the amount that he wants to transfer to my account is $1 million." *Id.* at 3–4.

Later that afternoon, another banker with Capital One was scheduled to meet with Shaalan at the IMF to receive signed paperwork to complete the transaction. *See* Emails at 3; DSUMF ¶ 9. At 2:09 p.m., defendant emailed the banker to say, "Mr. Shaalan signed the paper. Can you be here before 2:30? Sorry to rush you but I have a meeting at 2:30 to 3:30 PM today." Emails at 2–3. Defendant was not present when the banker arrived at the IMF and met with Shaalan, and she had no further involvement in the transaction until she received notification that she had received the funds. DSUMF ¶ 9, citing Salha Decl. ¶ 9.

Shaalan remained in the position of Special Advisor until the fall of 2019, when he lost his formal job title but was permitted to keep an office at the IMF and to retain defendant as his assistant. DSUMF ¶ 13, citing Salha Decl. ¶ 2. He was formally terminated in late February 2020. DSUMF ¶ 15, citing Salha Decl. ¶ 10.

**b. The checks**

Defendant explains the checks in her name by asserting that Shaalan did not know how to use an ATM machine and disliked waiting in line at the bank, so throughout her years of working for him, she would cash checks on his behalf to enable him to have cash on hand. Salha Decl. ¶ 23. According to defendant Salha, Shaalan would write a check payable to defendant, typically for $3,000, and she would deposit the check into her bank account, sometimes along with other personal deposits, and simultaneously withdraw the check amount in cash to give to Shaalan. DSUMF ¶¶ 37–38, 40, citing Salha Decl. ¶¶ 23–25. While withdrawing cash, she would sometimes withdraw additional cash from her account for her own personal use. DSUMF ¶ 40, citing Salha Decl. ¶ 25.

Defendant also relies on the declaration of another employee at the IMF, [redacted] Decl. of [redacted] Ex. D to Dep. of Yasmine Melehy [Dkt. # 57-3] (SEALED) [redacted] Decl.”). [redacted] recalled:

> While I was working for Mr. Shaalan, at regular intervals, whenever [he] needed cash, Mr. Shaalan made check with the ‘payable to’ line left blank or ‘cash,’ usually in the sum of $3,000. While I was never personally asked to cash them, Mr. Shaalan regularly asked other members of his staff to make the checks payable to themselves, cash the check, and to give him the cash in the amount of the check.

*Id.* ¶ 4.

Plaintiff alleged that defendant did not hand the cash over to Shaalan and actually used sixty-two of the checks for her own benefit. Second Am. Compl. ¶¶ 46–49. However, defendant has produced the documents underlying each transaction:

| | | |
|---|---|---|
| September 10, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 54 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| November 21, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 2 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's bank account, followed immediately by a withdrawal of $3,043.14. |
| December 8, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 3 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $4,500. |
| January 13, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 4 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's bank account, followed immediately by a withdrawal of $3,000.00. |
| February 6, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 5 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| March 9, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 6 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $2,000 into defendant's checking account, followed immediately by a withdrawal of $2,000. |
| March 27, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 7 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,170 with the description "Deposit |

| | | |
|---|---|---|
| | | check deposit," followed immediately by a withdrawal of $3,000. |
| April 20, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 8 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| May 13, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 9–10 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $4,000. |
| May 15, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 10 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| June 19, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 11 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| July 22, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 12 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| August 6, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 13 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $5,000 into defendant's checking account, followed immediately by a withdrawal of $5,000. |
| September 25, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 14 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |

| | | |
|---|---|---|
| October 21, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 15 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| November 17, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 16 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| November 24, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 16 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| January 12, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 17 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| February 12, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 18 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| February 26, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 18 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| March 9, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 19 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| June 30, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 20 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, |

| | | |
|---|---|---|
| | | followed immediately by a withdrawal of $3,000. |
| July 25, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 21 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,200 into defendant's account, followed immediately by a withdrawal of $3,200. |
| August 26, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 22 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $5,117.97 into defendant's account, followed immediately by a withdrawal of $3,000. |
| September 30, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 23 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $4,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| October 28, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 24 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| November 22, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 25 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| December 23, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 26 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $6,000. |
| February 17, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 27 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |

| | | |
|---|---|---|
| March 2, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 28 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| March 28, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 29 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| April 3, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 30 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| May 19, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 31 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| June 5, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 32 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| August 14, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 33–34 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| August 30, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 34 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| September 8, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 35 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking |

| | | |
|---|---|---|
| | | account, followed immediately by a withdrawal of $3,000. |
| September 15, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 35–36 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 25, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 37 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed by a withdrawal of $3,000. |
| November 3, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 38 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| November 22, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 39 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,710 into defendant's checking account, followed by a withdrawal of $3,000. |
| December 1, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 40 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| December 18, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 41 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| December 21, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 41 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |

| | | |
|---|---|---|
| February 2, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 42 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| March 13, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 43–44 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| March 15, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 44 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| April 5, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 45 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| April 18, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 46 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| May 4, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 47 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| May 8, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 47 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| August 7, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 48 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking |

| | | |
|---|---|---|
| | | account, followed by a withdrawal of $3,000. |
| August 23, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 49 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $10,000 into defendant's checking account, followed by a withdrawal of $10,000. |
| August 25, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 49 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $8,000. |
| September 14, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 50 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| September 24, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 51 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 23, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $4,890 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 24, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| October 29, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |

| | | |
|---|---|---|
| November 5, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 53 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |

**c. Shaalan's health and memory issues**

From 2017 through late-2019, Shaalan experienced occasional memory lapses, and in March 2020, he was diagnosed with late-onset Alzheimer's. DSUMF ¶ 20, citing Salha Decl. ¶¶ 17, 19, 21, 22; Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 14. The parties refer to Shaalan's mental state frequently in their briefing, and the record contains medical documentation from March 2010 until Shaalan's death in June 2021. *See* Ex. 3 to Decl. of Kalman Reyes [Dkt # 57-7] (SEALED). Given the importance of the chronology to resolving the pending motions, that history is set forth below:[3]

| | | |
|---|---|---|
| June 27, 2014 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 21–22 | Shaalan's medical record from the Cleveland Clinic titled "Office Visit in Dermatology" states, "Gen: Well-appearing." The same day, a medical record titled "Office Visit in Internal Medicine" notes, "General appearance showed medium body build, well-appearing." |
| May 19, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 20 | Medical record from the Cleveland Clinic titled "Office Visit in Thoracic Clinic" states that Shaalan is a "very pleasant 87-year-old-man" and that "[t]he patient is surprisingly fit for his age." |
| June 18, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 19 | Medical record from the Cleveland Clinic titled "Office Visit in Pulmonary Medicine" states, "General appearance: Well appearing, alert, in no acute distress, well-hydrated, well nourished" and "Mr. |

3 The Court has also created an appendix that combines the chronology of the financial transactions with the medical chronology.

| | | |
|---|---|---|
| | | Shaalan currently feels well. He walks 15 minutes to work without having to stop." |
| July 24, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 18 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "[Shaalan] is an ambulatory, functionally independent gentleman who appears younger than his stated age. He continues to work full time. His energy level and appetite are very good and he denies any unintentional weight loss." |
| August 14, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 16 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented. No acute distress." |
| November 19, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 15 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| March 10, 2016 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 14 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| September 14, 2016 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 17 | Medical record from the Cleveland Clinic titled "Abstract in Radiation Oncology" states, "General appearance: Alert and oriented." |
| April 4, 2017 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 11 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| August 10, 2017 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 8–10 | Medical record from the Cleveland Clinic titled "Office Visit in Neurology" states, "Apparently there has been some concern in the family of memory loss for the last year. On discussion with the patient, he does not feel he has a memory issue. . . . Finances: takes [care] of it himself." |

| | | |
|---|---|---|
| | | The same day, a medical record titled "Office Visit in Internal Medicine" states:<br><br>"Grand niece, Yasmine called earlier this year with concerns about memory. He was surprised that this had occurred although I had discussed this with him over the phone when this took place. He appeared somewhat bothered by her having made this contact and call. She was instructed and asked to attend his visit here when this occurred but is not present today. . . . He is not aware of any memory issues. He goes to the office every day. He is participating in all of his normal activities."<br><br>[redacted]<br><br>[redacted]<br><br>In a section titled "Recommendations," the record further states, "Undergo MRI scanning of brain including volume metric assessment." |
| January 9, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 7 | Medical record from the Cleveland Clinic states that Shaalan underwent a brain MRI and was assessed for "dementia." |
| January 11, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 6 | Medical record from the Cleveland Clinic regarding Shaalan's "MRI report" states, "Attached is [the] result of your recent MRI study of the brain. Results are satisfactory and show no significant worrisome abnormalities." |
| April 23, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 5 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |

| | | |
|---|---|---|
| September 11, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 4 | Medical record from the Cleveland Clinic titled "Office Visit in Internal Medicine" states, [redacted] |
| October 12, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 3 | Medical record from the Cleveland Clinic titled "Abstract in Internal Medicine" states:<br><br>"Have indicated to him that he will need to establish with a primary care provider locally who can better monitor and manage his blood pressure management going forward. [redacted] |
| April 3, 2019 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 2 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| June 19, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 2 | Medical record from Shaalan's local physician, Dr. Ace Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |
| July 25, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 3 | Medical record from Dr. Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |
| October 24, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 4–5 | Medical record from Dr. Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |

| | | |
|---|---|---|
| March 5, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 14 | Medical record from Johns Hopkin Medicine titled "Office Visit in JHCP Neurology Sibley." In a section titled, "Visit Diagnoses," the record states, [redacted] |
| June 11, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 10 | Medical record from Johns Hopkin Medicine states, "Yasmine El Melehy, niece, e-mailed SW the updated Power-of-Attorney which was done on 6/11/20 . . . ." |
| June 22, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 11 | Medical record from Johns Hopkin Medicine states: [redacted] [redacted] |
| December 21, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 6 | [redacted] |
| February 11, 2021 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 3–4 | [redacted] [redacted] |

After this diagnosis, plaintiff and her 93-year-old great uncle, Shaalan, were married in February 2021, and he passed away in June 2021. Def.'s Mot. at 2. Plaintiff filed this lawsuit in October of the same year.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

Defendant attacks the fraud claim on both timeliness and substantive grounds. First, she argues that the allegations regarding the $1,000,000 transfer in November 2014 and the checks written before October 29, 2018 are all time-barred under the District of Columbia's three-year statute of limitations, and that the limitations period cannot be tolled by the doctrine of *non compos mentis*. Def.'s Mot. at 7–12. As to the two remaining timely checks, defendant contends that plaintiff has failed to demonstrate any element of fraud by clear and convincing evidence. *Id.* at 12–20.[4]

### I. All but two of the alleged instances of fraud underlying Count One are barred by the statute of limitations.

The parties agree that the fraud claim is governed by D.C. Code § 12-301(a)(8), Def.'s Mot. at 7; Pl.'s Opp. at 5, which imposes a three-year statute of limitations measured "from the time the right to maintain [the] action accrues." D.C. Code § 12-301(a)(8). The complaint in this case was filed on October 29, 2021, which means that the fraud claim had to accrue on or after October 29, 2018 to fall within the actionable limitations period. But as defendant points out, most of the allegations accusing her of fraudulently obtaining funds occurred well before that date, as the claim is based on a $1,000,000.00 wire transfer in November 2014 and $196,000.00 in checks cashed between September 10, 2014 and November 6, 2018. Def.'s Mot. at 7–8.

4 Defendant also contends that plaintiff is barred from pursuing the fraud claim under the doctrine of unclean hands because she herself accepted funds from Shaalan during the period she claims he was financially incompetent, and because she purposefully destroyed boxes of discovery. Def.'s Mot. at 20–22. Given the Court's decision granting defendant summary judgment on statute of limitations and substantive grounds, it need not address the merits of those arguments.

Although section 12-301(a) does not define accrual, the District of Columbia Court of Appeals has explained that due to the "inherent delay" between the time fraud is perpetrated "and the time the victim awakens to the fact," a fraud claim accrues:

> when the plaintiff has either actual notice of [their] cause of action or is deemed to be on inquiry notice because if [they] had met her duty to act reasonably under the circumstances in investigating matters affecting [their] affairs, such investigation, if conducted, would have led to actual notice.

*In re Est. of Delaney*, 819 A.2d 968, 981–82 (D.C. 2003), quoting *Diamon v. Davis*, 680 A.2d 364, 372 (D.C. 1996). .

The court has warned, though, that the inquiry notice portion of the "rule does not . . . give the plaintiff *carte blanche* to defer legal action indefinitely if [they] know[] or should know that [they] may have suffered injury and that the defendant may have caused [them] harm." *Id.* at 982, quoting *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472–73 (D.C. 1994). "What constitutes acting reasonably under the circumstances . . . is a highly factual analysis, but usually requires that the injured party be ignorant of the fraud through no fault or want of diligence or care on his part." *Id.* (internal quotations omitted) (internal citations omitted). "The critical question in assessing the existence . . . of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Drake v. McNair*, 993 A.2d 607, 617 (D.C. 2010), quoting *Ray v. Queen*, 747 A.2d 1137, 1141–42 (D.C. 2000). "[A] party with immediate suspicions of wrongdoing has an obligation to move promptly and with reasonable diligence to inquire further into the matter." *Id.*, quoting *Est. of Delaney,* 819 A.2d at 982 (internal quotation marks omitted).

The claims in the complaint are being brought on behalf of Shaalan, and defendant has pointed to factual material in the record establishing that Shaalan was on notice of the $1 million transfer on November 3, 2014, "the date that [he] himself facilitated the transfer of $1 million,"

and that he was on notice of the allegedly fraudulent checks "on the date he signed each of them." Def.'s Mot. at 8. For the wire transfer, defendant points to the emails between herself and the Capital One Branch Manager from November 3, 2014, in which the Branch Manager confirms that he spoke to Shaalan over the phone about "the amount he wish[ed] to transfer into [defendant's] account." DSUMF ¶ 8; Emails at 5. For the checks, she points to the portion of her declaration describing the check cashing system Shaalan utilized to obtain cash, Salha Decl. ¶¶ 23–25; the declaration of a colleague at the IMF [redacted] Decl. ¶¶ 4–5; and the numerous bank records showing the date on which defendant deposited his checks and then immediately withdrew cash for each of the checks at issue, Ex. 10 to Salha Decl. at 2–54.

Plaintiff attempts to avert any finding that Shaalan was on notice by asserting that he "seemed to be wholly unaware" of the 2014 $1,000,000 wire transfer or the checks deposited and cashed between 2014 and 2018 until she "confronted" him about the issue in 2019. Pl.'s Opp. at 6–7. But she does not point to any indication of his confusion about, lack of awareness of, or dissatisfaction with the defendant or her handling of his finances until approximately a year *after* the last check was presented. And the only portions of the record she cites for support are her deposition and a declaration she executed after the deposition. *Id.*

In her deposition, plaintiff testified that at the end of 2019, she showed Shaalan a "Capital One bank statement" from 2014, and she described his response:

> [H]e said it does not make sense . . . . [H]e asked me if I have proof . . . . And somewhere in 2020 he asked me to call the police and let them be informed. And then somewhere in mid-2020 I asked him, "probably you gave her a loan, maybe you're trying to help her out." And he replied, "How much does a secretary make to pay me back a million dollars?"

Dep. of Yasmine Melehy, Ex. D to Pl.'s Opp. [Dkt. # 64-6] at 52:18–19, 53:12–20. Her declaration similarly states:

> 12. I first confronted [Shaalan] with the wire transfer at the end of 2019.
>
> 13. [Shaalan] at first said it did not make any sense.
>
> 14. When I pressed [Shaalan], he demanded proof.
>
> 15. I showed him the bank statement from November 2014.
>
> 16. In 2020 [Shaalan] accepted that he had been robbed by Ms. Salha and demanded I call the police.

Decl. of Yasmine Melehy [Dkt. # 63-3] (SEALED) ¶¶ 12–16.

One problem with this evidence is that all plaintiff can point to are statements Shaalan made *after* his well-documented mental decline, which, even as she describes, were prompted by her own questions and "pressing." *Id.* ¶ 14. And even by her own account, he did not "accept" the existence of the problem she identified until 2020. *Id.* ¶ 16.

While plaintiff posits that Shaalan did not understand the events while they were going on, and therefore, he was not on notice for purposes of the statute of limitations, that is belied by her own deposition testimony, *see* Ex. B to Def.'s Mot., Dep. of Yasmine Melehy [Dkt. # 57-1] at 163:1–164:9 ("Q. In 2014, did he seem able to get to and from work easily? A. I believe so . . . . Q . . . . Could he remain working in 2014, as far as you could tell? A. Yes. Q. It was a good thing for him to do? A. Yeah, yeah, yeah . . . ."), the declaration of another IMF employee [redacted] Decl. ¶¶ 3–4, and the contemporaneous email from the bank manager who confirmed that he spoke to Shaalan personally about the million-dollar transfer in November 2014. Emails at 5.

Moreover, neither portion of the record is enough to create a genuine dispute over the date on which Shaalan was put on notice because, to the extent plaintiff is seeking to introduce

Shaalan's statements to her for the truth of any facts they assert, they would be inadmissible hearsay. Def.'s Mot. at 6; Def.'s Reply at 4–6. To survive summary judgment, the party asserting the fact that is genuinely disputed must "support the assertion by[] citing to particular parts of materials in the record," Fed. R. Civ. Proc. 56(c)(1)(A), that are "capable of being converted into admissible evidence." *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1315 (D.C. Cir. 2021) (internal quotation marks omitted); *see* Fed. R. Civ. Proc. 56(c)(2) ("A party may object that the material cited to . . . dispute a fact cannot be presented in a form that would be admissible in evidence.").

Hearsay is an out-of-court statement made by a declarant that "a party offers in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2), and it is inadmissible unless it falls within a specific hearsay exception in the Federal Rules of Evidence. *See* Fed. R. Evid. 802. As the D.C. Circuit has explained, "when proffered evidence 'is sheer hearsay, it counts for nothing on summary judgment.'" *Klayman*, 6 F.4th at 1316, quoting *Greer*, 505 F.3d at 1315); *see Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("[Plaintiff]'s evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial . . . . It therefore counts for nothing.").

Plaintiff does not suggest that the statements fall within any exception to the hearsay rule, so they may not be admitted for the truth of the matter of any fact asserted. And even if plaintiff is relying simply on the fact that they were said as indicative of his mental state and level of understanding in late 2019 and early 2021, the statements of a man in the throes of "significant dementia," Ex. 1 to Reyes Decl. at 13, does not supply relevant or competent testimony concerning his state of mind years before. Therefore, the Court is left only with the evidence defendant adduced showing that Shaalan was aware of both the wire transfer and the checks on the dates on

which they were executed, which means that the fraud claim based on those items accrued well before the limitation cut-off date of October 29, 2018.

Plaintiff further argues that even if the claim accrued before the statute of limitations cut-off, the limitation period should be tolled because Shaalan "can be considered *non compos mentis*." Pl.'s Opp. at 7.

"Equitable tolling permits a plaintiff to avoid the bar of the limitations period," *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. 1998), and District of Columbia Code "provides that a person who is *non compos mentis* and who has failed to file a legal action in a timely fashion may bring the action 'within the time limited after the disability is removed.'" *Id.* at 580, quoting D.C. Code § 12-302(a)(2). "The code does not itself define *non compos mentis*, but "[t]he phrase . . . generally refers to someone incapable of handling her own affairs or unable to function [in] society.'" *Id.*, quoting *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 665 (D.C. 1997) (alteration to internal quotation). "[I]mpaired judgment alone is not enough to toll the statute of limitations"; "[t]he disability . . . must be 'of such a nature as to show she is unable to manage her business affairs or estate, or to comprehend her legal rights or liabilities.'" *Id.*, quoting *Decker v. Fink*, 422 A.2d 389, 392 (Md. Ct. Spec. App. 1980) (alterations omitted). The "hurdle is high" for the party asserting *non compos mentis*, and "[t]he court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed instances." *Id.* at 579–80.

Though plaintiff acknowledges that "*[n]on compos mentis* is a high bar[] and there is an absence of medical records suggesting it," she urges the Court to accept her improbable assertion that "Shaalan was incapable of handling his own basic affairs" from 2014 through 2019, but "[b]y the time he passed, he was clear headed, [and] understood that [defendant] cheated him out of the

$1,000,000.00, and an undetermined amount of cash . . . ." Pl.'s Opp. at 2, 8. In support, she cites paragraphs of her own declaration stating:

> 20. I saw [Shaalan] regularly during 2014. I thought that his unusual behavior stemmed from the loss of his wife. [Shaalan] frequently mentioned that he was being asked to sign a lot of papers by [defendant]. [Shaalan] also complained about not having cash on him because [defendant] had not given him any.
>
> 21. He would submit checks for cash through [defendant] multiple times because he thought he had not done so.
>
> 22. [Shaalan] became very forgetful in 2014, he did not recognize a close colleague, and fell asleep at meetings.
>
> 23. From 2014 to 2018 [Shaalan] made monetary gifts to family. [Shaalan] could not have done so without assistance from [defendant], and I do not know whether he knew or understood they were occurring.
>
> 24. During the 2017-2019 time frame, both me and Mohamed Badawy contacted the IMF [redacted]
>
> * * *
>
> 30. During the 2014-2019 time frame I frequently had to pay out of pocket for [Shaalan] as he did not have cash. [Shaalan] would frequently pay me back with checks. [Shaalan] would go to his favorite restaurant and not have cash to pay for his meals.

Melehy Decl. ¶¶ 20–24, 30.

Even if one accepts the statements in plaintiff's declaration as true, they do not come close to showing that Shaalan was "incapable" of handling his own affairs or "function[ing] in society" between November of 2014 and when the limitations period ended, as required by the standard for *non compos mentis*. Most of the statements refer to Shaalan's relationship with defendant and others or his monetary gifts generally, and are not at all related to his mental state. The most relevant statement is plaintiff's observation that Shaalan "became very forgetful in 2014," that "he did not recognize a close colleague," and that he "fell asleep at meetings." Melehy Decl. ¶ 22. But, as defendant points out, it is not at all clear from the declaration whether plaintiff had real,

personal knowledge of those circumstances, a requirement of Rule 56. *See* Fed. R. Civ. Proc. 56(c)(4) (a "declaration used to . . . oppose a motion must be made on personal knowledge"). Indeed, that paragraph of the declaration is directly contrary to her own deposition testimony:

> Q. . . . On what facts do you base your allegations that in November of 2014 Mr. Shaalan had a diminished mental state and was incapable of understanding what was occurring and unable to consent to it?
>
> A. He complained to me that he had to sign lots of documents and he was very upset that his term in the IMF is over. It was just lots of events happening in 2014.
>
> * * *
>
> Q. How often in 2014 did you see him?
>
> A. Every weekend.
>
> Q. Did you ever suggest that he undergo a neurological examination in 2014?
>
> A. No.
>
> Q. Did you ever suggest that he undergo a neurological examination at any point before 2017?
>
> A. No.
>
> Q. Was he living alone in November of 2014?
>
> A. Yes.
>
> Q. Was he – did he appear to be eating properly?
>
> A. Yes.
>
> Q. Did he appear to be dressing properly?
>
> A. In 2014?
>
> Q. Correct.
>
> A. Yes.
>
> Q. In 2014, did he seem able to get to and from work easily?

A. I believe so.

* * *

Q. . . . Could he remain working in 2014, as far as you could tell?

A. Yes.

Q. It was a good thing for him to do?

A. Yeah, yeah, yeah. The IMF is his life.

Ex. B to Def.'s Mot., Dep. of Yasmine Melehy [Dkt. # 57-1] 161:4–10, 163:1–164:9.[5]

While plaintiff offers up the observations in her declaration, defendant has supplied the Court with several years of Shaalan's medical records containing notes of objective observers. They provide a timeline of his mental status, [redacted] The records show that from June 27, 2014 to April 4, 2017, Shaalan's doctors described him as "well-appearing," "surprisingly fit for his age," and "alert, in no acute distress, well-hydrated, well nourished." Ex. 3 to Reyes Decl. at 11, 15–22. [redacted]

---

5 Defendant submits that plaintiff's declaration is a "sham affidavit," in which she put forth new facts that were either missing from or contradict her prior deposition testimony in order to survive summary judgment. Def.'s Reply at 6, 8. The D.C. Circuit has observed that "[v]irtually every circuit has adopted a form of the so-called 'sham affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless [she] ' . . . can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007), quoting *Pyramid Sec. Ltd. v. IB Res., Inc.,* 924 F.2d 1114, 1123 (D.C. Cir. 1991). However, considering the declaration, the Court finds that it is not enough to meet the standard for showing that Shaalan was *non compos mentis*, so it need not determine whether the declaration is a "sham." *See, e.g.*, *Flynn v. R.C. Tile*, 353 F.3d 953, 957–58 (D.C. 2004) (declining to consider whether the district court correctly concluded that a party's declaration was a "sham affidavit" because the district court already took the declaration into consideration during its merits determination); *U.S. Dep't of Just. v. Daniel Chapter One*, 650 F. App'x 20, 25 (D.C. Cir. 2016) ("Although . . . the district court may have misapplied the [sham affidavit] rule, . . . we nonetheless believe that the district court's award should be affirmed. In its decision below, the district court noted that even if the declaration were to be believed, the information in it would not change its assessment . . . .").

[redacted] *id.* at 10, and they also Shaalan's reaction to plaintiff's involvement:

> Grand niece, Yasmine called earlier this year with concerns about memory. He was surprised that this had occurred although I had discussed this with him over the phone when this took place. He appeared somewhat bothered by her having made this contact and call. She was instructed and asked to attend his visit here when this occurred but is not present today. . . . He is not aware of any memory issues. He goes to the office every day. He is participating in all of his normal activities.

*Id.* at 9.

[redacted] *Id.* at 6–7. The January 11, 2018 report of this assessment for dementia announced the following results: "satisfactory and show no significant worrisome abnormalities." *Id.* [redacted] and on October 12, Shaalan's doctor advised him, "that he will need to establish with a primary care provider locally who can better monitor and manage his blood pressure management going forward. [redacted] *Id.* at 3–4. Shaalan got set up with a local physician and that doctor noted on June 19, 2019, July 25, 2019, and October 24, 2019: "mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgement." Ex. 4 to Reyes Decl. at 2.

[redacted]

[redacted] Ex. 1 to Reyes Decl. at 14. Plaintiff provided the medical team with Shaalan's power-of-attorney on June 11, 2020, and on June 22, the medical records state:

> [redacted]

Ex. 1 to Reyes Decl. at 11.

Altogether, plaintiff's sparse statements regarding Shaalan's "forgetful" mental state in 2014 are not enough to create a genuine dispute of material fact over whether he was *non compos mentis*, which requires evidence that he be "unable to manage his business affairs . . . or to comprehend her legal rights or liabilities" during the limitations period. Plaintiff herself testified that Shaalan was living alone, eating properly, dressing properly, and was able to work during that time period, and the medical records do not reflect a decline prior to 2020. And there is absolutely no support in the medical records for plaintiff's assertion that he suddenly regained competency in 2021, just in time to figure out the that he has been defrauded. Therefore, there is no basis for the Court to toll the statute of limitations, and the portion of the fraud claim challenging the $1,000,000 wire transfer in November 2014 and any checks dated before October 29, 2018 are barred.

## II. The Court will grant summary judgment to defendant on Count One because there is no genuine dispute of material fact and plaintiff has failed to produce evidence as to any of the elements of fraud.

The remaining timely allegations underlying the fraud claim consist of two checks: a $3,000 check cashed on October 29, 2018, and a $3,000 check cashed on November 5, 2018. Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52–53.

"[T]o succeed on a claim of fraudulent misrepresentation, the claimant must prove six elements: (1) that a false representation was made, (2) in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) action taken in detrimental reliance upon the representation. Moreover, . . . reliance on the misrepresentation must (6) have been justifiable." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 808 (D.C. 2016) (citations omitted).

Though the claimant must prove the elements of her claim by "clear and convincing evidence" at trial, at the summary judgment stage, "the trial court does not make credibility determinations or weigh the evidence." *Id.* Still, "to survive a motion for summary judgment, there must be 'at least enough evidence to make out a prima facie case in support of' the nonmovant's position if credibility determinations and inferences were drawn in the claimant's favor. *Id.*, quoting *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281–82 (D.C.2002). And because a fraud "claim must be demonstrated by heightened proof to succeed, the nonmovant claimant must produce more substantial evidence to successfully oppose summary judgment." *Id.* (internal quotations omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (noting that "inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits").

Plaintiff's briefing about the checks is thin. The second amended complaint alleges that defendant "regularly wrote checks using [] Shaalan's checkbook to herself, and instructed [] Shaalan to sign them," and that she "lied . . . about the purpose of the checks" to "use[] the funds for her own benefit." Second Am. Compl. ¶¶ 39, 46. Her opposition to the motion for summary judgment states only that defendant "cashed checks in her own account, commingled the money, admits to commingling withdrawals, and never using receipts," and that "Shaalan routinely did not

have cash on him which is sufficient proof that he was not receiving the benefit of the withdrawals." Pl.'s Opp. at 12.

Plaintiff's response to defendant's statement of undisputed material fact identifies the factual material that she believes gives rise to a triable dispute of fact concerning the two checks from 2018: (1) the portion of defendant Salha's declaration explaining how she would receive a check from Shaalan, deposit it "into [her] bank account (sometimes along with other deposits), simultaneously withdraw the check amount (and sometimes additional cash for [her] own personal use), and then g[i]ve Mr. Shaalan the withdrawn cash in the entire check amount," Salha Decl. ¶ 25; and (2) the portions of plaintiff's own declaration stating that "[Shaalan] also complained about not having cash on him because [defendant] had not given him any," "[d]uring the 2014-2019 time frame I frequently had to pay out of pocket for [Shaalan] as he did not have cash," and "[Shaalan] did not spend money freely, and other than his favorite restaurant there is no explanation why he needed such excessive amounts of cash." Melehy Decl. ¶¶ 20, 30, 31.

None of that is enough to defeat summary judgment on the fraud claim. First, defendant's own description of the check cashing arrangement does not give rise to a genuine dispute of material fact that bears on any element of fraud; she does not admit making any false representations to anyone and simply explains that the arrangement was designed to enable Shaalan to have cash on hand without a trip to the bank. The fact that the funds were deposited into defendant's account, or that withdrawals may have been made at the same time does not by itself support an inference that defendant was being deceptive. Moreover, the financial records of each transaction are fully consistent with defendant's statement that she would deposit a check, typically in the amount of $3,000, and immediately withdraw that amount in cash. Defendant's description of events is also corroborated by the declaration of [redacted]

Faced with that, plaintiff's declaration does not create an issue for the jury to resolve. Her statement recounting that on an unspecified occasion, Shaalan told plaintiff that defendant "had not given him any" cash is, again, inadmissible hearsay that the Court cannot consider. *See Klayman*, 6 F.4th at 1316.[6] And the other statement, that plaintiff "frequently had to pay" for unnamed expenses for Shaalan because he did not have cash, and her opinion that he generally did not "need" excessive amounts of cash do not suffice to support a claim of fraud. Plaintiff's declaration does not identify any specific false statement made by defendant, nor is there any evidence showing defendant's knowledge of the falsity of the statement or intent to deceive at the time it was made, or Shaalan's detrimental reliance on the statement. The fact that Shaalan did not have cash on him at some unspecified points in the 2014–2019 time period and generally did not need cash is, at best, circumstantial and only tangentially related to the alleged wrongdoing.[7]

---

6 Even if one were to consider the statement, it is too vague and incomplete to support the interpretation plaintiff ascribes to it. If on some date, Shaalan did say that Salha had not given him money, that could simply mean he had no cash because she had not gone to the bank yet, not that she withheld it. The fact that he is unavailable to confirm or clarify the statement is exactly why such hearsay is inadmissible.

7 If anything, plaintiff's deposition testimony is consistent with defendant's description of the arrangement.

> Q. What proof do you have that the $3,000 checks that Ms. Salha cashed for Mr. Shaalan were actually used by Ms. Salha.
>
> A. His IRS was not paid. . . . .
>
> Q. And how would Ms. Salha cashing a check for Mr. Shaalan have anything to do with him paying taxes?
>
> A. **Because when I asked him how he retrieved money, he said I'll write a check to Hala, and she would bring the cash** but there are times she didn't come back with the cash.

Melehy Dep. [Dkt. # 57-1] at 126:12–127:2 (emphasis added).

## CONCLUSION

To survive summary judgment, there must be a genuine dispute of material fact based on evidence on which a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 247–48. This lawsuit has been pending since 2021, plaintiff has had ample time to support her allegations, and she has not responded to the motion for summary judgment with facts that would enable a jury to find in her favor. Therefore, defendant's motion for summary judgment will be **GRANTED**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: August 7, 2026

## APPENDIX A

| Date | Citation | Description |
|---|---|---|
| June 27, 2014 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 21, 22 | Shaalan's medical record from the Cleveland Clinic titled "Office Visit in Dermatology" states, "Gen: Well-appearing." The same day, a medical record titled "Office Visit in Internal Medicine" notes, "General appearance showed medium body build, well-appearing." |
| September 10, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 54 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| November 3, 2014 | Ex. 3 to Salha Decl. [Dkt. # 56-6] | Defendant and the Capital One Branch Manager exchange emails regarding the $1,000,000 wire transfer alleged to be fraudulent in Count One, which occurs that day. |
| November 21, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 2 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's bank account, followed immediately by a withdrawal of $3,043.14. |
| December 8, 2014 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 3 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $4,500. |
| January 13, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 4 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's bank account, followed immediately by a withdrawal of $3,000.00. |
| February 6, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 5 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking |

| | | |
|---|---|---|
| | | account, followed immediately by a withdrawal of $4,500. |
| March 9, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 6 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $2,000 into defendant's checking account, followed immediately by a withdrawal of $2,000. |
| March 27, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 7 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 with the description "Deposit check deposit," followed immediately by a withdrawal of $3,170. |
| April 20, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 8 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| May 13, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 9–10 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $4,000. |
| May 15, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 10 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| May 19, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 20 | Medical record from the Cleveland Clinic titled "Office Visit in Thoracic Clinic" states that Shaalan is a "very pleasant 87-year-old-man" and that "[t]he patient is surprisingly fit for his age." |
| June 18, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 19 | Medical record from the Cleveland Clinic titled "Office Visit in Pulmonary Medicine" states, "General appearance: Well appearing, alert, in no acute distress, well-hydrated, well nourished" and "Mr. Shaalan currently feels well. He walks 15 minutes to work without having to stop." |

| | | |
|---|---|---|
| June 19, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 11 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| July 22, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 12 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| July 27, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 18 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "[Shaalan] is an ambulatory, functionally independent gentleman who appears younger than his stated age. He continues to work full time. His energy level and appetite are very good and he denies any unintentional weight loss." |
| August 6, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 13 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $5,000 into defendant's checking account, followed immediately by a withdrawal of $5,000. |
| August 14, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 16 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented. No acute distress." |
| September 25, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 14 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| October 21, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 15 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |

| | | |
|---|---|---|
| November 17, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 16 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| November 19, 2015 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 15 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| November 24, 2015 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 16 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| January 12, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 17 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| February 12, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 18 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| February 26, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 18 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| March 9, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 19 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| March 10, 2016 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 15 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |

| | | |
|---|---|---|
| June 30, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 20 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| July 25, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 21 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,200 into defendant's account, followed immediately by a withdrawal of $3,200. |
| August 26, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 22 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $5,117.97 into defendant's account, followed immediately by a withdrawal of $3,000. |
| September 14, 2016 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 17 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| September 30, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 23 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $4,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| October 28, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 24 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| November 22, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 25 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| December 23, 2016 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 26 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $6,000. |

| | | |
|---|---|---|
| February 17, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 27 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| March 2, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 28 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| March 28, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 29 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| April 3, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 30 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| April 4, 2017 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 11 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| May 19, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 31 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed immediately by a withdrawal of $3,000. |
| June 5, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 32 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| August 10, 2017 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 8–10 | Medical record from the Cleveland Clinic titled "Office Visit in Neurology" states, "Apparently there has been some concern in the family of memory loss for the last |

| | | |
|---|---|---|
| | | year. On discussion with the patient, he does not feel he has a memory issue. . . . Finances: takes [care] of it himself."<br><br>The same day, a medical record titled "Office Visit in Internal Medicine" states:<br><br>"Grand niece, Yasmine called earlier this year with concerns about memory. He was surprised that this had occurred although I had discussed this with him over the phone when this took place. He appeared somewhat bothered by her having made this contact and call. She was instructed and asked to attend his visit here when this occurred but is not present today. . . . He is not aware of any memory issues. He goes to the office every day. He is participating in all of his normal activities."<br><br>[redacted]<br><br>[redacted]<br><br>In a section titled "Recommendations," the record further states, "Undergo MRI scanning of brain including volume metric assessment." |
| August 14, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 33–34 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| August 30, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 34 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking |

| | | |
|---|---|---|
| | | account, followed immediately by a withdrawal of $3,000. |
| September 8, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 35 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| September 15, 217 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 35–36 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 25, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 37 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's account, followed by a withdrawal of $3,000. |
| November 3, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 38 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| November 22, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 39 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,710 into defendant's checking account, followed by a withdrawal of $3,000. |
| December 1, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 40 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| December 18, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 41 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |

| | | |
|---|---|---|
| December 21, 2017 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 41 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| January 9, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 7 | Medical record from the Cleveland Clinic states that Shaalan underwent a brain MRI and was assessed for "dementia." |
| January 11, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 6 | Medical record from the Cleveland Clinic regarding Shaalan's "MRI report" states, "Attached is result of your recent MRI study of the brain. Results are satisfactory and show no significant worrisome abnormalities." |
| February 2, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 42 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| March 13, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 43–44 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| March 15, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 44 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| April 5, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 45 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| April 18, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 46 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |

| | | |
|---|---|---|
| April 23, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 5 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| May 4, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 47 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| May 8, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 47 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| August 7, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 48 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| August 23, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 49 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $10,000 into defendant's checking account, followed by a withdrawal of $10,000. |
| August 25, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 49 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $8,000. |
| September 11, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 4 | Medical record from the Cleveland Clinic titled "Office Visit in Internal Medicine" states, [redacted] |
| September 14, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 50 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking |

| | | |
|---|---|---|
| | | account, followed by a withdrawal of $3,000. |
| September 24, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 51 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 12, 2018 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 3 | Medical record from the Cleveland Clinic titled "Abstract in Internal Medicine" states:<br><br>"Have indicated to him that he will need to establish with a primary care provider locally who can better monitor and manage his blood pressure management going forward. [redacted] |
| October 23, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $4,890 into defendant's checking account, followed by a withdrawal of $3,000. |
| October 24, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| October 29, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 52 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. |
| November 5, 2018 | Ex. 10 to Salha Decl. [Dkt. # 56-13] (SEALED) at 53 | Bank record from the "Bank-Fund Staff Federal Credit Union" showing a deposit of $3,000 into defendant's checking account, followed immediately by a withdrawal of $3,000. This is the last |

| | | |
|---|---|---|
| | | allegedly fraudulent check underlying Count One. |
| April 3, 2019 | Ex. 3 to Reyes Decl. [Dkt. # 57-7] (SEALED) at 2 | Medical record from the Cleveland Clinic titled "Office Visit in Radiation Oncology" states, "General appearance: Alert and oriented." |
| June 19, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 2 | Medical record from Shaalan's local physician, Dr. Ace Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |
| July 25, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 3 | Medical record from Dr. Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |
| October 24, 2019 | Ex. 4 to Reyes Decl. [Dkt. # 57-8] (SEALED) at 4–5 | Medical record from Dr. Lipson, stating, "PSYCHIATRIC: mental status: alert and oriented x 3; appropriate affect and demeanor; recent and remote memory are intact; good insight and judgment[.]" |
| March 5, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 14 | Medical record from Johns Hopkin Medicine titled "Office Visit in JHCP Neurology Sibley." In a section titled, "Visit Diagnoses," the record states, [redacted] |
| June 11, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 10 | Medical record from Johns Hopkin Medicine states, "Yasmine El Melehy, niece, e-mailed SW the updated Power-of-Attorney which was done on 6/11/20." |
| June 22, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 11 | Medical record from Johns Hopkin Medicine states: [redacted] |

| | | |
|---|---|---|
| | | [redacted] |
| December 21, 2020 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 6 | [redacted] |
| February 11, 2021 | Ex. 1 to Reyes Decl. [Dkt. # 57-5] (SEALED) at 4 | [redacted] |